ALICIA VEGA VDA. DE TORRES y OTROS, demandantes y recurridos, *v.* ADMINISTRACIÓN DE SERVICIOS MÉDICOS Y OTROS, demandados y recurrentes.

*Número:* R-85-249 *Resuelto:* 31 de marzo de 1986

*Alex González* y *Bufete Alex González, Eduardo Méndez Cabrán,* abogados de la Administración de Servicios Médicos de Puerto Rico; *Ana M. López Prieto,* abogada del Municipio de San

Juan, recurrentes; *Jesús M. Rivera Arvelo,* abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

La Administración de Servicios Médicos solicitó ante nos que revisáramos una sentencia dictada por el Tribunal Superior, Sala de San Juan, que le impuso responsabilidad solidaria en unión al Municipio de San Juan por concepto de daños y perjuicios. La importancia que suscitan los planteamientos de las partes en torno al complejo estructural del Centro Médico y las entidades allí participantes y la responsabilidad civil dimanante en casos de impericia médica acaecidos en dicho lugar, nos mueve a expresarnos mediante opinión.

I

El 8 de mayo de 1977, Gerson Torres Soto, de 27 años de edad, se laceró la garganta al atravesársele el hueso de "la suerte" de un pollo que comió en un restaurante. En la Sala de Emergencia del Centro Médico fue atendido por un doctor que le indicó que tenía una irritación en la garganta, y le recetó antibióticos. Al otro día amaneció con fiebre, fuerte dolor en la garganta y con mucha dificultad al tragar. Fue al Centro de Diagnóstico de San José, perteneciente al Municipio de San Juan, y desde allí fue referido de nuevo a la Sala de Emergencia donde lo vio un cirujano, y le tomaron unas placas de Rayos X. De la Sala de Emergencia lo refirieron a la clínica externa de oído, nariz y garganta del Centro Médico. Cómo persistió el dolor intenso en la garganta y la dificultad para tragar, regresó en dos ocasiones adicionales a la Sala de Emergencia. En ninguna de estas ocasiones lo hospitalizaron. El 19 de mayo tuvo un vómito de sangre y fue llevado a la Sala de Emergencia. Por primera vez desde el accidente se ordenó su hospitalización y fue internado en la Sección de Coronaria del Hospital Municipal. Falleció esa tarde.

El Tribunal Superior concluyó que la muerte de Torres se debió a la negligencia en el tratamiento médico que recibió en la Sala de Emergencia y en el Centro de Diagnóstico de San José. El tribunal a quo resarció a los familiares de Torres por los daños y perjuicios sufridos, e impuso responsabilidad solidaria a los codemandados, Municipio de San Juan y la Administración de Servicios Médicos de Puerto Rico. (En adelante denominada, la Administración.) La Administración cuestiona la determinación del foro de instancia de que dicha corporación respondía solidariamente por el daño ocasionado. Alega que no se presentó prueba alguna que "estableciera la relación causal necesaria entre el daño sufrido por la parte demandante y las actuaciones u omisiones del personal de la Administración de Servicios Médicos". Aduce que no es responsable porque era el Municipio de San Juan el único encargado de la administración de la Sala de Emergencia del Centro Médico.

Mediante trámite de mostrar causa, el 27 de junio de 1985 concedimos veinte (20) días a los recurridos para comparecer a exponer fundamentos por los cuales "no debe expedirse [el] auto y modificar la sentencia para eximir de la responsabilidad total a la Administración de Servicios Médicos". Los recurridos han comparecido y argumentado según intimamos en nuestra orden. Luego de examinar cuidadosamente los escritos de las partes, la legislación aplicable y su historial, al amparo de la Regla 50 de este Tribunal confirmamos la sentencia recurrida.

Una evaluación responsable de las alegaciones de ambas partes requiere que primero examinemos la ley habilitadora de la Administración de Servicios Médicos y su historial legislativo.

## II

La Administración de Servicios Médicos de Puerto Rico es una instrumentalidad del Gobierno del Estado Libre

Asociado de Puerto Rico que funciona independientemente del Departamento de Salud y sus otros organismos. La Administración tiene a su cargo la responsabilidad de organizar, operar y administrar los servicios centralizados del Centro Médico y de coordinar los servicios básicos de cuidado médico y hospitalario. 24 L.P.R.A. sec. 342c. La Administración es la sucesora jurídica de la Corporación de Servicios del Centro Médico de Puerto Rico, entidad encargada de los servicios centralizados para la fecha de la muerte de Gerson Torres. Art. 6 de la Ley Núm. 66 de 22 de junio de 1978. (24 L.P.R.A. sec. 342e.) Como tal, viene obligada a satisfacer las sentencias contra la desaparecida Corporación. Art. 7. (24 L.P.R.A. sec. 342f.)

A la Corporación de Servicios del Centro Médico de Puerto Rico, la Legislatura le asignó, entre otros, los siguientes poderes:

> [O]rganizar, dirigir y administrar los servicios centralizados, así como nombrar, contratar y designar personal médico para dar tratamiento directo a pacientes en los servicios médicos auxiliares centralizados así como también, nombrar, contratar y designar personal médico en los servicios médico auxiliares centralizados, previa autorización de la Junta de Directores. Esta contratación debe limitarse a servicios auxiliares. *Disponiéndose, que se entenderá por servicios médico auxiliares,* los servicios de laboratorio existentes, y que se creen en el futuro, incluyendo patología, radiología, *salas de emergencia* y servicios de anestesia. (Énfasis suplido.) Ley Núm. 73 de 18 de junio de 1974.

La Administración ha retenido esos poderes, deberes y obligaciones. Art. 8 de la Ley Núm. 66. (24 L.P.R.A. sec. 342g.)

Los servicios centralizados[1] comprendían todos aquellos *servicios médicos auxiliares,* servicios de tipo comercial y ser-

---

[1] El Diccionario de la Lengua Española en su vigésima edición define "centralizar" de la siguiente manera:

"1. Reunir varias cosas en un centro común.

vicios administrativos que las entidades participantes acordaran integrar para ser usados en común por las instituciones miembros que componen el Centro Médico. Art. 2(5) (24 L.P.R.A. sec. 342a(5)). Las "entidades participantes" son aquellas que operan una o más instituciones en el Centro Médico con personalidad jurídica propia e independiente de la Administración. Estas "entidades participantes" contribuyen proporcionalmente a sufragar los gastos de la operación de los "servicios centralizados".

 No existe controversia en cuanto a que el Hospital Municipal de San Juan era una entidad participante de los servicios centralizados bajo el control de la Administración. Así lo admitió el recurrido Municipio de San Juan en una moción de sentencia sumaria presentada ante el tribunal de instancia. Igualmente, la recurrente admite tal hecho en su Solicitud de Revisión. Tampoco fue controvertido el hecho crucial de que hubo negligencia en el cuidado y atención médica desplegado en la Sala de Emergencia.

Un análisis cuidadoso del historial legislativo, tanto de la creación de la Corporación como de su sucesora, revela que el legislador puertorriqueño quiso proteger a la ciudadanía en aquellos casos de negligencia médica ocurridos en las facilidades centralizadas del complejo hospitalario mediante la creación de una persona jurídica contra quien dirigir la causa de acción. Para ello le fue conferida la facultad de demandar y ser demandada. Art. 5(r) de la Ley Núm. 106 (24 L.P.R.A. sec. 49e(r)); *Vda. de López* v. *E.L.A.*, 104 D.P.R. 178, 181 (1975); Art. 8 de la Ley Núm. 66 (24 L.P.R.A. sec. 342g(a)). Tal conclusión refleja el examen de la Exposición de Motivos de la Ley Núm. 106 de 26 de junio de 1962:

---

"2. Hacer que varias cosas dependan de un poder central." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. 1, pág. 304.

Por otro lado, se acerca ya la fecha en que comenzarán a operar los Servicios Centralizados a ser administrados por la Junta de Directores para servir a los pacientes de cada uno de los hospitales miembros del Centro. *En casos de litigio en que una persona haya sufrido daño al recibir tales servicios, ésta se econtraría en una situación complicada para determinar la entidad a quien reclamar, ya que hay seis agencias que prestan estos servicios conjuntamente. No está claramente definida la personalidad jurídica del actual Centro Médico de Puerto Rico.*

. . . . . . . .

[E]s necesario la creación de una corporación pública, cuyo organismo de dirección debe ser la Junta de Directores del Centro Médico de Puerto Rico, originalmente creada por la Ley de 1957, según enmendada, capacitándola por disposición de Ley con ciertos poderes tales como poseer terrenos, hacer empréstitos para la construcción de facilidades de vivienda para ciertas categorías de personal, a recibir rentas y a aplicar las mismas al pago de sus empréstitos, *a demandar y a ser demandada y a operar los servicios centrales del Centro Médico de Puerto Rico de acuerdo con la estructura administrativa que la misma se provea* y de los sistemas administrativos de personal, presupuesto, contabilidad, compras y otros que ella misma organice y administre. (Énfasis suplido.)

Esta visión recogió expresamente la recomendación contenida en el Informe de la Comisión de lo Jurídico de la Cámara de Representantes, presidida entonces por el Hon. Benjamín Ortiz, en el sentido de que "al centralizar la administración del Centro Médico en una sola entidad jurídica, fija en ella la responsabilidad de la operación facilitando así sus relaciones con el público que sólo tiene que entenderse con una sola persona jurídica para todo lo relacionado con dicho Centro Médico". 15 Diario de Sesiones de la Asamblea Legislativa, Vol. 3, pág. 1185 (1962). La Comisión de Salud y Beneficencia de la Cámara suscribió el proyecto sujeto al cumplimiento de las condiciones enumeradas por la Comisión de lo Jurídico. Más significativo aún resulta el hallazgo de que fue

la propia Junta de Directores del Centro Médico la que propuso el 6 de marzo de 1962 este concepto de responsabilidad:

> Conviene señalar, además, que se acerca la fecha en que comenzarán a operar los servicios centralizados. Estos servicios serán operados, administrados y financiados, según se dispone en la legislación en vigor, por las entidades participantes en el Proyecto del Centro Médico, constituidas en una Junta de Directores en la cual están representadas cada una de dichas entidades. En caso de litigio presentado por una persona que hubiera sufrido daño al recibir tales servicios, ésta se encontraría en una posición difícil para determinar a quién habría de hacer la reclamación correspondiente y las propias entidades participantes tendrían igual confusión.
>
> Se considera también que, debido a la naturaleza, complejidad y magnitud de los servicios centralizados y a que estos serían administrados y financiados por siete (7) entidades diferentes, cada una con personalidad jurídica distinta y funcionando bajo legislación y reglamentación diferentes, conviene operar los servicios centralizados en la forma más semejante posible a la de un negocio privado. Por esta razón se propone [que] se constituyan los servicios centralizados en una corporación pública. Memorando Explicativo a la Cámara de Representantes de Puerto Rico, P. de la C. 558, sometido por el Dr. Francisco Berio, Presidente Interino, Junta de Directores del Centro Médico, págs. 3 y 4.

Cuando se enmendó la ley que creó la Corporación y ésta pasó a ser la Administración, se mantuvo el mismo esquema jurídico. En el informe de las Comisiones de Salud, de Bienestar y de Hacienda, referentes al Proyecto del Senado 580 que se convirtió en ley, se recalcó la conveniencia de "la integración de la administración del nuevo organismo en una sola fuente de responsabilidad". P. del S. 580, pág. 4. Asimismo, en el informe conjunto de las Comisiones de Salud, Bienestar y Calidad Ambiental y de Gobierno del 9 de mayo de 1978, se concluyó que era beneficioso que los servicios que se prestaban en el Centro Médico fueran "reorientados y se consoliden en una sola fuente de responsabilidad". Íd., pág. 1.

Todavía tiene vigencia la preocupación del legislador. En fecha reciente, tuvimos ocasión de confrontarnos con una situación que reflejó el grave peligro para los ciudadanos reclamantes de que se frustrara su causa de acción debido a la confusión existente en torno a este complejo médico hospitalario. *Berríos* v. *U.P.R.*, 116 D.P.R. 88 (1985). Constatamos entonces, tal como lo visualizó el legislador, la necesidad de la existencia de una persona jurídica contra quien dirigir la causa de acción por los daños causados en este servicio centralizado. Después de todo "[e]l Estado, como una corporación, es una figura jurídica que se compone de personas, bienes, derechos y deberes, pero por necesidad tiene que actuar, y actúa, a través de personas que son sus agentes". *García Colón* v. *Srio. de Hacienda*, 99 D.P.R. 779, 783 (1971).

■ Ante la comunidad se ha proyectado la idea de que el Centro Médico ofrece unos servicios comunes a todos los usuarios. Por eso el legislador dispuso que cuando se actúa negligentemente en uno de los servicios centralizados se pueda demandar a una sola entidad, la Administración. Se creó de esta manera una persona jurídica contra quien proceder judicialmente por los daños ocasionados, tanto en los servicios médicos auxiliares ofrecidos directamente por ésta, como en aquellos ofrecidos por agentes o contratistas independientes. Sin embargo, la naturaleza de su responsabilidad dependerá del tipo de servicio suministrado, la relación contractual entre la Administración y la entidad participante, y el grado de control efectivamente ejercido sobre la contratación y supervisión del personal. Una vez es demandada, corresponde a la Administración establecer la relación contractual con las otras entidades y radicar las acciones pertinentes contra sus auxiliares, agentes o contratistas independientes para que el tribunal pueda dirimir la responsabilidad de cada uno frente al demandante.

Cuando el servicio lo ofrece una de las entidades participantes y no es uno de los servicios centralizados, esa depen-

dencia responde directamente al demandante en forma exclusiva por sus actos propios bajo las disposiciones jurídicas pertinentes.

■ Finalmente, en ciertas circunstancias la Administración también podría responder bajo la doctrina de "responsabilidad o autoridad aparente". Anteriormente definimos el alcance de esta doctrina y concluimos que quien intente probar la responsabilidad aparente de una persona debe demostrar: "(1) que de buena fe confió en la conducta que tenía ante sí, y (2) que esa confianza lleve a una persona razonable a creer que de hecho existía una relación de principal y de agente". *Berríos* v. *U.P.R.*, supra, pág. 97, n. 2; *Márquez Vega* v. *Martínez Rosado*, 116 D.P.R. 397, 408 (1985).

### III

Así nos adentramos en el complejo estructural de la Administración a los fines de desentrañar su mecánica funcional y detectar su fuente de responsabilidad particular en este caso. Conforme las disposiciones de leyes citadas y su historial legislativo, la Corporación era responsable de planificar, coordinar, operar y administrar, directa o indirectamente, tales servicios provistos por las instituciones miembros del Centro Médico.

Para 1965, la Corporación de Servicios del Centro Médico de Puerto Rico promulgó una guía de funciones básicas y ámbitos de los servicios centrales. Mediante la misma, los servicios centralizados se clasificaban en tres categorías: 1) *servicios totalmente centralizados*, donde había absoluto control de la Administración; 2) *servicios centralizados en lo que concierne a facilidades físicas y personal auxiliar*, que estaban bajo la administración de la Corporación, reteniendo las instituciones participantes la responsabilidad por el servicio médico, y 3) *servicios centralizados bajo la administración de una de las instituciones miembro del Centro Médico*, en el

cual la entidad central no intervenía en la administración per se. En todos estos servicios centralizados, la Corporación ejercía un grado de control de diversa índole.

Los servicios ofrecidos en la Sala de Emergencia estaban comprendidos entre los servicios auxiliares centralizados del Centro Médico, que diariamente atiende a miles de puertorriqueños, en su gran mayoría personas de escasos recursos. En tal esquema de organización la Sala de Emergencia era un servicio centralizado *de uso común por todas las instituciones miembros* de la Corporación.

Para todos los usuarios indigentes de este complejo, la Sala de Emergencia siempre se ha proyectado y ha actuado como un servicio auxiliar de todo el complejo, a través del cual se atienden las emergencias de los hospitales de las entidades participantes. Con excepción del Hospital Industrial, desde esta sala se atienden por primera vez todas las emergencias para luego ser referidas a los distintos hospitales de las entidades participantes.

■ En *Vda. de López* v. *E.L.A.*, supra, pág. 180, tuvimos la oportunidad de examinar la operación de la Sala de Emergencia y mediante *dictum* afirmamos que era un servicio centralizado administrado directamente por la Corporación del Centro Médico. Un examen de los autos de este caso confirma esta conclusión. El Dr. Luis Ramón Irizarry, Director Médico del Hospital Municipal, y el Sr. Jorge De Jesús Rojas, Administrador del Hospital, declararon bajo juramento que para la fecha de los hechos la Corporación de Servicios del Centro Médico administraba la Sala de Emergencia. El Dr. Juan F. Jiménez, Director Médico del Hospital Municipal en 1982, por su parte, también confirmó los testimonios anteriores y a su vez aclaró que el Municipio de San Juan sólo pagaba los gastos de atención médica de emergencia de los pacientes que vivían en el área geográfica del municipio mientras que la Corporación sufragaba los servicios ofrecidos a los pacientes de los otros municipios. Finalmente, de la prueba

documental admitida se desprende que todos los formularios utilizados por la Sala de Emergencia en este caso eran de la Corporación de Servicios del Centro Médico de Puerto Rico.

En este caso la Administración responde no solamente por disposición de ley, sino porque el servicio de emergencia era ofrecido directamente por ellos a todos los usuarios. Tanto nuestra jurisprudencia como la prueba desfilada en este caso, demuestran que la Corporación administraba directamente estas facilidades de emergencia.

El planteamiento central de la recurrente, de que el municipio tenía el control de la Sala de Emergencia, se desvanece y tropieza con la realidad allí existente. Del análisis anterior se desprende que la Administración responde, porque operaba directamente la Sala de Emergencia.

Por lo tanto, coincidimos con el juez de instancia en torno a que hubo daños indivisibles causados por unas actuaciones combinadas del Municipio de San Juan y de la Administración como sucesora jurídica de la Corporación de Servicios Médicos.

■ Nuestro ordenamiento jurídico reconoce y establece la existencia de solidaridad entre cocausantes de un perjuicio ante el damnificado. *Ramos* v. *Caparra Dairy, Inc.*, 116 D.P.R. 60 (1985); *Cubano* v. *Jiménez et al.*, 32 D.P.R. 167 (1923); *Cruz et al.* v. *Frau*, 31 D.P.R. 92 (1922). Frente al tercero perjudicado los cocausantes son solidariamente responsables, aunque entre ellos cada uno responda únicamente por el grado de su responsabilidad en el daño causado. *Serralta* v. *Martínez Rivera*, 97 D.P.R. 466 (1969); *Torres* v. *A.M.A.*, 91 D.P.R. 714 (1965); *García* v. *Gobierno de la Capital*, 72 D.P.R. 138 (1951).

## IV

Nos resulta difícil comprender la posición asumida por la Administración. La tragedia de los recurridos, una humilde familia que pierde al padre por una actuación negligente de

los empleados de varias instituciones médicas hospitalarias públicas, se ha prolongado por más de ocho años de litigación debido a problemas procesales y porque las entidades responsables se han aprovechado del complejo estructural del Centro Médico para dilatar la resolución final de esta controversia. La recurrente, encargada de los servicios médicos auxiliares que se ofrecen en el Centro Médico, se niega a reconocer su responsabilidad no solamente con esta familia, sino con el público en general que allí acude, en abierta contravención con su ley habilitadora y con la realidad existente en esa institución pública. En el caso de autos, la Administración no podía negar que el servicio de emergencias que se ofrecía en el Centro Médico era, para la fecha del suceso, un servicio centralizado de esa *instrumentalidad pública.*

El Tribunal Superior todavía no ha fijado la proporción en que responderán de los daños el Municipio de San Juan y la Administración de Servicios Médicos. Para que se efectúe esa determinación, ambos tienen a su disposición el mecanismo de la acción niveladora. En dicha acción pueden dirimir sus respectivos grados de responsabilidad. De esta manera se garantiza una compensación y un procedimiento justo a los damnificados y a su vez se le ofrece a los cocausantes del daño la oportunidad de ajustar sus respectivas responsabilidades internas de acuerdo con sus relaciones corporativas y los hechos particulares del caso.

Por los fundamentos expuestos, *se expide el auto de revisión solicitado y se dicta sentencia confirmatoria.*